# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| TRACEY DOWLING, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 02-CV-3181 |
| | : | |
| vs. | : | |
| | : | |
| THE HOME DEPOT, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT HOME DEPOT U.S.A., INC.'S BRIEF
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**CARPENTER, BENNETT & MORRISSEY**
Attorneys for Home Depot U.S.A., Inc.
Three Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-7711

PATRICK G. BRADY, ESQ. (PGB-6513)
Pro Hac Vice
        Of Counsel and
        On the Brief.

CLARA H. RHO, ESQ. (CHR-3245)
Pro Hac Vice
        On the Brief.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.     Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.     Home Depot's Anti-Harassment Policy . . . . . . . . . . . . . . . . . . . . . . . . . 4

        C.     Plaintiff's Knowledge and Receipt of Home Depot's
               Anti-Harassment Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        D.     Mr. Kihenjo's Position at Home Depot . . . . . . . . . . . . . . . . . . . . . . . . 6

        E.     The Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

               1.     The Alleged Harassment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                        a.     Home Depot's Investigation of Plaintiff's Complaint . . . . 9

                        b.     Outcome of the Investigation . . . . . . . . . . . . . . . . . . . . . 10

               2.     Alleged Constructive Discharge . . . . . . . . . . . . . . . . . . . . . . . . 12

               3.     Alleged Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    POINT I

        HOME DEPOT IS ENTITLED TO SUMMARY JUDGMENT
        DISMISSING PLAINTIFF'S COMPLAINT BECAUSE NO
        GENUINE ISSUE OF MATERIAL FACT EXISTS WARRANTING
        A TRIAL ON ANY OF PLAINTIFF'S CLAIMS . . . . . . . . . . . . . . . . . . . . . . . 26

POINT II

HOME DEPOT IS ENTITLED TO SUMMARY JUDGMENT ON
PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM . . . . . . . . . . . . 27

A.    Mr. Kihenjo Was Plaintiff's Co-Worker  . . . . . . . . . . . . . . . . . . . . . . . 28

B.    Home Depot Is Not Liable Because It Was Not Negligent  . . . . . . . . . 29

POINT III

PLAINTIFF'S CLAIM FOR CONSTRUCTIVE DISCHARGE
FAILS AS A MATTER OF LAW BECAUSE SHE CANNOT
PROFFER ANY EVIDENCE THAT SHE WAS SUBJECT
TO INTOLERABLE WORKING CONDITIONS  . . . . . . . . . . . . . . . . . . . . . . 33

POINT IV

PLAINTIFF'S RETALIATION CLAIM FAILS AS A
MATTER OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

A.    Plaintiff Cannot Establish a Prima Facie Case of Retaliation  . . . . . . . . 39

        1.    Plaintiff Suffered No Retaliatory Adverse
              Employment Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

        2.    Plaintiff Cannot Establish Any Causal Connection
              Between the Actions of Which She Complains and
              Her Alleged Protected Activities  . . . . . . . . . . . . . . . . . . . . . . . . 41

B.    Plaintiff Cannot Establish That Home Depot's Actions Were
        A Pretext For Retaliation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

POINT V

HOME DEPOT IS ENTITLED TO SUMMARY JUDGMENT ON
PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES . . . . . . . . . . . . . . . . . . 46

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

## TABLE OF AUTHORITIES

**CASES**                                                                          Page(s)

Allen v. National R.R. Passenger Corp.,
    90 F. Supp.2d 603 (E.D. Pa. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

Andrews v. City of Philadelphia,
    895 F.2d 1469 (3d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Audenreid v. Circuit City Stores, Inc.,
    97 F.Supp.2d 660 (E.D. Pa. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Billet v. CIGNA Corp.,
    940 F.2d 812 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

Bonenberger v. Plymouth Twp.,
    132 F.3d 20 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Bouton v. BMW of N. Am., Inc.,
    29 F.3d 103 (3d. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Boykins v. Lucent Technologies, Inc.,
    78 F. Supp. 2d 402 (E.D. Pa. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Bray v. Marriott Hotels,
    110 F.3d 986 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Burlington Indus., Inc. v. Ellerth,
    524 U.S. 742 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986), cert. denied, 484 U.S. 1066 (1988) . . . . . . . . . . . . . . . . . . 26, 27

Clowes v. Allegheny Valley Hosp.,
    991 F.2d 1159 (3d Cir.), cert. denied, 510 U.S. 964 (1993) . . . . . . . . . . . . . . . . . 35, 36

Connors v. Chrysler Fin. Corp.,
    160 F.3d 971 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

DiIenno v. Goodwill Indus.,
    162 F.3d 235 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Duffy v. Paper Magic Group, Inc.,
    265 F.3d 163 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Faragher v. City of Boca Raton,
    524 U.S. 775 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

Fuentes v. Perskie,
    32 F.3d 759 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 45

Goss v. Exxon Office Sys. Co.,
    747 F.2d 885 (3d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Grande v. State Farm Mut. Auto. Ins. Co.,
    83 F. Supp. 2d 559 (E.D. Pa. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Harris v. L&L Wings, Inc.,
    132 F.3d 978 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

Hersh v. Allen Products Co.,
    789 F.2d 230 (3d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Hurley v. Atlantic City Police Department,
    993 F. Supp. 396 (D.N.J. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Kent v. Henderson,
    77 F. Supp. 2d 628 (E.D. Pa. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Kolstad v. Am. Dental Ass'n,
    527 U.S. 526 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47

Kunin v. Sears Roebuck & Co.,
    175 F.3d 289 (3d Cir. 1999), cert. denied, 528 U.S. 964 (1999) . . . . . . . . 28, 29, 30, 32

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986), cert. denied, 481 U.S. 1029 (1987) . . . . . . . . . . . . . . . . . . . . . 27

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 45

McLaughlin v. Rose Tree Media Sch. Dist.,
    52 F. Supp.2d 484 (E.D. Pa. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Pamintuan v. Nanticoke Mem'l Hosp.,
    192 F.3d 378 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Reyes v. McDonald Pontiac GMC Truck, Inc.,
    997 F. Supp. 614 (D.N.J. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Robinson v. City of Pittsburgh,
    120 F.3d 1286 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

Shaner v. Synthes,
    204 F.3d 494 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 43, 44

Sheridan v. E.I. DuPont de Nemours and Co.,
    100 F.3d 1061 (3d Cir. 1996), cert. denied,  521 U.S. 1129 (1997) . . . . . . . . . . . . . . 38

Swentek v. U.S. Air, Inc.,
    830 F.2d 552 (4th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Texas Dep't of Community Affairs v. Burdine,
    450 U.S. 248 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Turner v. Schering-Plough Corp.,
    901 F.2d 335 (3d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Weiss v. Parker Hannifan Corp.,
    747 F. Supp. 1118 (D.N.J. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Weston v. Pennsylvania,
    251 F.3d 420 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 41

Williams v. Borough of West Chester,
    891 F.2d 458 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Woodson v. Scott Paper Co.,
    109 F.3d 913 (3d Cir. 1996), cert. denied, 522 U.S. 914 (1997) . . . . . . . . . . . . . . . . 37

## STATUTES

42 U.S.C. §2000(e), et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 27

## COURT RULES

Fed.R.Civ.P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Pa. Rules Crim. P. 180, 181 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## **PRELIMINARY STATEMENT**

Defendant Home Depot U.S.A., Inc. (improperly identified in the Complaint as "The Home Depot") (hereinafter referred to as "Home Depot" or "Company") submits this Memorandum of Law in support of its Motion for Summary Judgment to dismiss the Complaint filed by plaintiff Tracey Dowling ("plaintiff" or "Dowling").

In her three-count Complaint, plaintiff alleges that: (i) on or about July 2, 1999, she was subjected to a hostile work environment in Home Depot's Allentown, Pennsylvania Store by a co-worker, Kenneth Kihenjo, and (ii) thereafter retaliated against by Home Depot for complaining about the alleged harassment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000(e), et seq. ("Title VII") (Count One & Two). Plaintiff further alleges that in or about March 2001, as a result of the alleged harassment and retaliation, she was constructively discharged in violation of Title VII (Count Three).

Plaintiff's hostile work environment claim fails because no basis exists in law or fact to hold Home Depot liable for the single incident involving the alleged acts of Mr. Kihenjo. The undisputed record on discovery shows that Home Depot maintains a well-publicized sexual harassment policy and plaintiff was aware of Home Depot's complaint procedure for notifying the Company of alleged harassment. The record evidence also demonstrates that after plaintiff reported the single incident of alleged harassment to her supervisor on July 7, 1999, Home Depot immediately investigated the allegations and addressed the situation. Plaintiff admits that she suffered no other harassment by Mr. Kihenjo. Accordingly, Home Depot cannot be held liable for the one alleged act of harassment by Mr. Kihenjo.

Also, the record evidence and all reasonable inferences drawn therefrom do not support plaintiff's claim of constructive discharge. Having moved to Maryland from Pennsylvania

in October 2000 to be near her boyfriend, plaintiff no longer wished to commute to Pennsylvania for her job. After accepting employment with Lowe's Companies, Inc. on March 13, 2001, plaintiff voluntarily resigned her employment with Home Depot on March 21, 2001. Plaintiff cannot raise a genuine issue of material fact showing that the working conditions at Home Depot in March 2001 were such that a reasonable person would have resigned. Plaintiff's only reason for resigning was that she did not want to commute to Pennsylvania. As a matter of law, judgment should be entered in favor of Home Depot on plaintiff's constructive discharge claim.

Finally, there is no basis in law or fact in support of plaintiff's retaliation claim. Plaintiff cannot meet her prima facie case because she has not identified any conduct by Home Depot constituting an adverse employment action. Nor can plaintiff show that any purported adverse actions were casually related to her complaint of harassment. Finally, there is no record evidence to support a finding that the complained of "adverse actions" were a pretext for retaliation.

For these reasons, discussed in detail below, Home Depot respectfully submits that summary judgment should be granted dismissing plaintiff's Complaint in its entirety.

2

## STATEMENT OF FACTS

**Procedural History**

1.      In or about August 2001, plaintiff filed a Complaint against Home Depot and five of its current and former employees, Kenneth Kihenjo ("Mr. Kihenjo"), Gregg Smith ("Mr. Smith"), Dean Drakis ("Mr. Drakis"), Roger Pegram ("Mr. Pegram") and Amy Booe ("Ms. Booe") in the United States District Court for the District of New Jersey.  Plaintiff claimed that defendants unlawfully discriminated against her in violation of Title VII arising out of her employment with Home Depot.

2.      On February 15, 2002, Home Depot moved to dismiss the individual defendants under Title VII and to transfer venue from the District of New Jersey to the District Court for the Eastern District of Pennsylvania.  In response to Home Depot's motion, plaintiff filed cross-motions to amend her Complaint to assert violations under the New Jersey Law Against Discrimination and the Pennsylvania Human Relations Act.  Home Depot opposed the cross-motions.  In May 2002, plaintiff withdrew her cross-motions and consented to transfer venue to the Eastern District of Pennsylvania. (See Consent Order, attached as Exh. 1 to Brady Cert.).[1]  Plaintiff also voluntarily dismissed her claims against the individual defendants.  (Id.).

---

[1]"Brady Cert." refers to the Certification of Patrick G. Brady, Esq., dated November 7, 2002, submitted herewith.

**Factual Background**[2]

A.    **Plaintiff**

3.    Plaintiff is a former employee of Home Depot. (Dowling Dep. at 36).[3] Plaintiff

commenced employment with Home Depot as a sales associate in or about February 1992. (Id. at

624). In April 1998, plaintiff was promoted to the position of loss prevention supervisor. (Id. at 99).

Plaintiff reported initially to Gregg Smith, regional loss prevention manager, and subsequently to

Dean Drakis, who replaced Mr. Smith as regional loss prevention manager. (Id. at 109-110, 121-22).

4.    As a loss prevention supervisor, plaintiff was assigned to Store No. 4105 in

Bethlehem, Pennsylvania ("Bethlehem Store") and Store No. 4108 in Allentown, Pennsylvania

("Allentown Store").[4] (Dowling Dep. at 106, 114-15).

B.    **Home Depot's Anti-Harassment Policy**

5.    Home Depot has a written policy prohibiting harassment of any kind in its workplace.

The policy in effect at the time plaintiff was a loss prevention supervisor stated, in pertinent part, that:

> Home Depot is committed to ensuring that our associates work in an
> environment of mutual respect, free of harassment and discrimination.
> Home Depot does not tolerate harassment or discrimination of

---

[2]For purposes of this Motion for Summary Judgment only, Home Depot accepts as true plaintiff's deposition testimony cited herein.

[3]"Dowling Dep." refers to the deposition of plaintiff Tracey Dowling taken on July 12, 2002, September 4, 2002 and October 3, 2002, excerpts of which are attached to the Brady Cert. as Exhibit 2.  "Kihenjo Dep." refers to the deposition of Kenneth Kihenjo taken on September 20, 2002, excerpts of which are attached to the Brady Cert. as Exhibit 3.  "Booe Dep." refers to the deposition of Amy Booe taken on September 25, 2002, excerpts of which are attached to the Brady Cert. as Exhibit 4.  "Drakis Dep." refers to the deposition of Dean Drakis taken on October 8, 2002, excerpts of which are attached to the Brady Cert. as Exhibit 5.  "Power Dep." refers to the deposition of Alan Power taken on October 18, 2002, excerpts of which are attached to the Brady Cert. as Exhibit 6. "Drakis Cert." refers to the Certification of Dean Drakis, dated November 6, 2002, submitted herein.

[4]The Allentown Store is also known as the Whitehall Store. (Dowling Dep. at 114-15).

> associates, customers, or vendors with regard to race, sex, color, age, religion, national origin, disability, or for any other reason prohibited by law.

See 1999 Employee Handbook entitled "Associate Orientation Guide," p. 78, attached to the Drakis Cert. as Exhibit J.

6.    The policy also expressly informs an employee of the complaint procedure available to notify Home Depot of alleged harassment:

> If you believe you are being harassed or exposed to conduct you find offensive, ask the person to stop immediately.   If the conduct continues, contact a member of management.   If you are not comfortable discussing the problem with your manager, or if you believe that your concern is not being appropriately resolved, contact your Store Manager, District Manager, Human Resource Manager, or Division VP of Human Resources.

(See Exhibit J, p. 78, attached to the Drakis Cert.).

7.    The Handbook sets out an "Open Door Policy" by which an employee may report complaints or problems:

> The Home Depot is committed to providing a climate of two-way, open, honest, and respectful communication without fear of retaliation. . .Your supervisor's door is always open to resolve workplace issues in a quick and fair manner.  The Open Door Policy is intended to provide a positive employee relations environment supporting the Home Depot's values of Respect for All People, Doing the "Right" Thing, Building Strong Relationships, and Taking Care of Our People. . . If your Department Supervisor or Assistant Manager cannot help you, the problem should be taken next to the Store Manager, District Manager, Regional Vice President, and finally, to the Division President.  Keep in mind that your Human Resource Manager is always available to help you with concerns and issues.

(See Exhibit J, p. 79, attached to the Drakis Cert.).  In addition, the policy provides a 1-800 alert telephone number that is available to associates who wish to report harassment but want to remain anonymous.  (Id. at p. 78).

5

8.    To ensure that these policies are followed, all management levels at Home Dept are trained on the Company's harassment policy.  (Booe Dep. at 19-21).

**C.    Plaintiff's Knowledge and Receipt of Home Depot's Anti-Harassment Policy**

9.    Plaintiff received Home Depot's Employee Handbook when she began employment with Home Depot.[5]  (See plaintiff's Acknowledgment Form, attached to the Brady Cert. as Exh. 7). Upon commencement of employment, plaintiff participated in Home Depot's orientation program. (Dowling Dep. at 581-82).   During this orientation, plaintiff reviewed Home Depot's policies including: "Open Door Policy"; "Equal Employment"; and "Harassment." (See plaintiff's Orientation Checklist attached to the Brady Cert. as Exh. 8; Dowling Dep. at 625).

10.    Plaintiff admits that she was aware of Home Depot's policy on harassment and the procedure for reporting complaints.  (Dowling Dep. at 580-82).  Plaintiff further testified that she attended a class and watched videotapes concerning the anti-harassment policy.  (Id. at 581).

**D.    Mr. Kihenjo's Position at Home Depot**

11.    Kenneth Kihenjo was an assistant store manager of Home Depot's Allentown Store for approximately two years. (Dowling Dep. at 126; Kihenjo Dep. at 24-25).  Mr. Kihenjo testified that throughout his employment with Home Depot he has received on-going training regarding sexual harassment and discrimination in the workplace.  (Kihenjo Dep. at 39-47).

12.    Mr. Kihenjo was not plaintiff's supervisor.  (Dowling Dep. at 521-22, 109-10). According to plaintiff, she, as a loss prevention supervisor, and Mr. Kihenjo, as an assistant store

---

[5]The version of the Employee Handbook that plaintiff received in February 1992, setting forth the Company's anti-harassment and open door policies, is substantively the same as the 1999 Associate Orientation Handbook.  (Compare Drakis Cert., Exh. J, pp. 78, 79, and Exh. K, p.12).

manager, were "both a form of management." (Id. at 132). Plaintiff did not report to or work for Mr. Kihenjo at any time:

> Q:    In his capacity as assistant store manager did you have any understanding as to whether or not he could discipline you?
> A:    As an assistant store manager we were peers.
> Q:    Do you have any understanding during the period of time that you worked in store 4108 when Mr. Kihenjo was there whether or not Mr. Kihenjo ever scheduled any of your work schedule or anything like that?
> A:    Not that I know of.

(Id. at 521-22; emphasis added).

13.    Other than plaintiff, no other employee has brought a complaint of inappropriate touching against Mr. Kihenjo. (Kihenjo Dep. at 55).

## E.    The Claims

### 1.    The Alleged Harassment

14.    The single incident of sexual harassment plaintiff complains of allegedly occurred on July 2, 1999. (Complaint, ¶13). Prior to July 1999, plaintiff admits that she had no problems with Mr. Kihenjo, had not been inappropriately touched by him, and was unaware of any complaints against him. (Dowling Dep. at 130-31, 135-36). Indeed, plaintiff describes her relationship with Mr. Kihenjo, prior to July 1999, as "friendly"-- they went to a restaurant for lunch together and plaintiff spoke to Mr. Kihenjo about his wife and child. (Id. at 140). Notably, during a management meeting prior to July 1999 and attended by store management staff, plaintiff testified that she put her head on Mr. Kihenjo's chest and he put his arm around her.

> Q:    There was an incident where I had gone to the returned – return desk and I had come back to the training room, and it was just a back and forth battle with the customer up at the desk. And I had come back and I walked over. He says

> you're all right? And I put my head on his chest. He put his
> arm around me. It was like it's all right, and that was about it.
>
> Q:    Did that offend you?
> A:    No, because it wasn't inappropriate.

(Id. at 135-36).

15.    Plaintiff claims that on July 2, 1999, while she and Mr. Kihenjo were alone in the
manager's office at the Allentown Store, Mr. Kihenjo inappropriately touched her. (Dowling Dep.
at 156-58, 168-72). Plaintiff claims that, while she was on the telephone with Home Depot's office
in Atlanta, Mr. Kihenjo on two occasions briefly touched her leg, thigh, and crotch. (Id. at 168-73).
Prior to leaving the manager's office, plaintiff alleges that Mr. Kihenjo asked her to give him a hug,
which she did.[6] (Id. at 175-76). Mr. Kihenjo purportedly then asked her "how [she] expected him
to go back to work being so excited or being so hard." (Id. at 175). Plaintiff testified that she then
proceeded to leave the manager's office, said hello to an associate outside the office, and
(notwithstanding the alleged incident that had just occurred) "asked Ken [Kihenjo] to handle
something in receiving for her" and then left. (Id. at 177).

16.    Although plaintiff was at Home Depot's divisional offices in South Plainfield on July
5 and July 6, 1999, and was aware that the human resources department was located there, she admits

---

[6]Plaintiff also hugged and touched other employees, including the Store Manager in the
Bethlehem Store. (Drakis Dep. at 48-51, 58-60; Power Dep. at 51). Some of these employees
complained to Home Depot that they felt uncomfortable with plaintiff's physical contact with them.
(Booe Dep. at 94; Drakis Dep. at 58-60; Drakis Cert., Exh. F). Plaintiff was counseled about these
incidents. (Dowling Dep. at 295-96, 400-02).

that she did not report the alleged harassment to Home Depot at that time.[7] (Dowling Dep. at 182-83).

### a.    Home Depot's Investigation of Plaintiff's Complaint

17.    On or about July 7, 1999, plaintiff reported for the first time the alleged incident to Home Depot when she told her supervisor, Gregg Smith. (Dowling Dep. at 180). As a result of plaintiff's complaint, Home Depot promptly conducted an investigation. The very same day that plaintiff reported the alleged incident to Mr. Smith, he, with plaintiff present, called Amy Booe, Human Resources Manager. (Id. at 190). Ms. Booe interviewed plaintiff on the telephone on July 7 about the alleged incident. (Booe Dep. at 48-52; Dowling Dep. at 190, 193-94). Ms. Booe also asked plaintiff to provide a written statement concerning the Kihenjo incident. (Dowling Dep. at 220-21).

18.    At the end of the meeting and telephone conference on July 7, Mr. Smith suggested that plaintiff take the rest of the week off, which plaintiff did. (Dowling Dep. at 200).

19.    On July 8, 1999, plaintiff faxed her written statement to Ms. Booe, and within two days, Ms. Booe contacted plaintiff to discuss the information contained in plaintiff's written statement. (Dowling Dep. at 227-29).

20.    Although plaintiff takes issue with the fact that Ms. Booe did not meet with her "face to face," plaintiff concedes that she told Ms. Booe "everything" on the telephone relating to the Kihenjo incident. (Dowling Dep. at 220, 260-61). Moreover, plaintiff admits that there is no

---

[7]Plaintiff, however, contacted the police department on July 3, 1999, to complain of sexual harassment. (Dowling Dep. at 180).

9

additional information that she needed to communicate to Ms. Booe face-to-face which she did not convey in her written statement and their telephone conversations. (Id. at 260-61).

21.     On July 8, 1999, Ms. Booe interviewed Mr. Kihenjo regarding plaintiff's allegations. (Booe Dep. at 58-60). Mr. Kihenjo unequivocally denied plaintiff's accusations.[8] (Id. at 59-60). Booe also interviewed other employees at the Allentown Store, but received no information as to plaintiff's assertions of harassment.[9] (Id. at 65-68).

### b.     Outcome of the Investigation

22.     With Mr. Kihenjo's denial, and no third party witnesses, Ms. Booe was not able to substantiate plaintiff's accusations. (Booe Dep. at 42-44). Nevertheless, as a precautionary measure, Ms. Booe, along with Roger Pegram, then District Manager, met with Mr. Kihenjo on July 16, 1999 and counseled him on Home Depot's policy against harassment. (Id. at 81-82). An Associate Action Notice documenting the July 16 counseling was placed in Mr. Kihenjo's personnel file. (See Associate Action Notice, attached to the Brady Cert. as Exh. 9).

23.     On July 16, 1999, less than 10 days after plaintiff reported the alleged harassment, Amy Booe and Roger Pegram met with plaintiff to inform her of the outcome of the investigation. (Dowling Dep. at 261). They advised plaintiff that her allegations against Mr. Kihenjo could not be substantiated. (Id. at 262-63).

_____

[8]Mr. Kihenjo acknowledged that he hugged plaintiff prior to leaving the manager's office. (Kihenjo Dep. at 65). According to Mr. Kihenjo, plaintiff initiated the hug. (Id.).

[9]On July 8, 1999, Ms. Booe interviewed Phil Danaher, an assistant store manager, who was in the office on July 2 with plaintiff and Mr. Kihenjo prior to the alleged incident. (Booe Dep. at 67). Thereafter, on July 12, 1999, Ms. Booe spoke to Rich Zorn, the manager of the Allentown Store, and asked him to prepare a statement setting forth any issues that may have occurred in the store regarding plaintiff and Mr. Kihenjo within the past three weeks. (Id. at 75).

24.    At the July 16 meeting, plaintiff requested a transfer away from the Allentown Store where Mr. Kihenjo was an assistant store manager. (Dowling Dep. at 269). Home Depot granted her request.[10] (Drakis Dep. at 46). Plaintiff admits she was no longer assigned to the Allentown Store. (Dowling Dep. at 270).[11]

25.    After the July 2, 1999 incident, plaintiff does not identify any additional alleged harassing conduct by Mr. Kihenjo. (Dowling Dep. at 146). Indeed, plaintiff admits that she had no further contact with Mr. Kihenjo after July 1999. (Id. at 272-73, 588).

26.    Thereafter, on July 22, 1999, plaintiff advised Amy Booe and Gregg Smith that Linda Wallback, a co-worker, informed her that Mr. Kihenjo had made an inappropriate comment to Ms. Wallback in the past. (Dowling Dep. at 223). Ms. Booe and Mr. Smith spoke with Ms. Wallback. (Booe Dep. at 103). Ms. Wallback stated that Mr. Kihenjo asked her out to lunch and remarked on

---

[10]In or about September 1999, plaintiff was assigned loss prevention responsibilities for Store 4110 in Reading, Pennsylvania ("Reading Store"). (Dowling Dep. at 116). She continued to be responsible for the Bethlehem Store. (Id.).

[11]After the internal investigation was concluded in July 1999, plaintiff pursued criminal action against Mr. Kihenjo. Mr. Kihenjo was arrested on or about August 19, 1999 for indecent assault and summary harassment. (Dowling Dep. at 313). As a result of the arrest, Mr. Kihenjo was placed on an involuntary leave of absence pursuant to Home Depot's policy. (Kihenjo Dep. at 84). Mr. Kihenjo was advised by Al Bailey, Vice President of Human Resources, that under Home Depot's policy he would be reinstated only if a "not guilty" determination was reached on the criminal charge. (Id. at 119). At the preliminary hearing in November 1999, Mr. Kihenjo entered into a plea agreement. The indecent assault charge was withdrawn and he was placed into the Accelerated Rehabilitative Disposition ("ARD") program. (Dowling Dep. at 365-67). Contrary to plaintiff's belief that Mr. Kihenjo was found "guilty," under the ARD program, Mr. Kihenjo was not convicted of a crime because the charge against him was deferred until he completed the program. See Pa. Rules Crim. P. 180, 181. Mr. Kihenjo completed three months of probation. So long as Mr. Kihenjo satisfactorily completed the probation, the criminal charge is dismissed and his record of arrest automatically expunged. See Pa Rules Crim. P. 186. According to Mr. Kihenjo, he believed that the charges filed against him were withdrawn and that he had been found not guilty. (Kihenjo Dep. at 134-35).

one occasion that she had a nice figure.  (Id.).  Ms. Wallback, however, stated that Mr. Kihenjo had

never physically touched her.  (Id.).  Ms. Booe asked Ms. Wallback for a written statement detailing

her interactions with Mr. Kihenjo in order to determine whether further action should be taken.  (Id.

at 104-05).  Despite repeated telephone calls from Ms. Booe to Ms. Wallback, Ms. Booe never

received a statement from her. (Id. at 105).  Because she did not receive the requested information,

Ms. Booe was unable to take further action.  (Id. at 117).

### 2.    Alleged Constructive Discharge

27.    Some 16 months after the July 2, 1999 incident with Mr. Kihenjo, plaintiff took a leave

of absence on October 11, 2000 allegedly due to stress.  (Dowling Dep. at 526).

28.    Plaintiff testified that when she submitted her leave of absence form in October 2000

she intended to relocate to Maryland because her boyfriend was moving to the Maryland area.

(Dowling Dep. at 59-60, 526).  Plaintiff, in fact, did relocate to Maryland in October 2000.  (Id. at

34, 59).

29.    On September 30, 2000, plaintiff applied for employment at Lowe's Companies, Inc.

("Lowe's") in Maryland.  (Dowling Dep. at 58-59; see Lowe's employment application attached to

the Brady Cert. as Exh. 10).    In November 2000, while on leave of absence from Home Depot,

plaintiff interviewed at Lowe's for an assistant store manager position.  (Dowling Dep. at 87).

30.    Plaintiff returned to work at Home Depot on or about January 9, 2001.  (Dowling

Dep. at 548).  While on her leave of absence, Home Depot reorganized its loss prevention department

in its stores, and the loss prevention supervisor position was eliminated.  (Id. at 61-62, 485-86).  Due

to the reorganization, plaintiff, like others holding the loss prevention supervisor position, had to seek

other employment within Home Depot.  (Dowling Dep. at 79).  Plaintiff attended a counseling session

at Home Depot's Delaware store to assist her and other loss prevention supervisors in obtaining other positions within Home Depot (Dowling Dep. at 78-79), and she completed a "Career Interest Worksheet" ranking, from one through seven, those jobs in which she was most interested. (see Career Interest Worksheet attached to the Brady Cert. as Exh. 11).

31.     Plaintiff ranked the inventory specialist position her first choice; she ranked "store positions" (i.e., sales associate) her fourth choice.[12] (Brady Cert., Exh. 11). Plaintiff was offered her first choice, the inventory specialist position, which she accepted:

> Q:     Was inventory specialist your first choice?
> A:     Yes.
>                    *        *        *
> Q:     If I recall your prior testimony that was the job you received, is that correct?
> A:     Correct.

(Dowling Dep. at 553-554; Brady Cert., Exh. 11).

32.     Home Depot offered plaintiff the inventory specialist position for the Virginia area, but she rejected it because "Mr. Kihenjo was working in the Washington, D.C. area." (Dowling Dep. at 84).  Subsequently, plaintiff was offered the inventory specialist position covering the Philadelphia

---

[12]Although plaintiff now testifies that her poor performance reviews prevented her from applying for the sales associate position in Home Depot's Glen Burnie, Maryland store after she returned from leave of absence in January 2001 (Dowling Dep. at 467-70), she admits that at the time she was seeking alternative jobs due to the elimination of the loss prevention supervisor position, the inventory specialist position was her first choice (Id. at 553).  In fact, plaintiff ranked the position of sales associate her fourth choice on the Career Interest Worksheet she submitted to Home Depot in January 2001.  (Brady Cert., Exh. 11).

market, which she accepted.[13]  (Id. at 82).  In this position, plaintiff reported to David Hurley, inventory specialist manager.  (Id. at 565).

33.    An inventory specialist is responsible for overseeing store preparation for merchandise inventories and is responsible for accurate execution of the inventory day physical count and final physical inventory certificate.  (see Job Description attached to Brady Cert. as Exh. 12).  In this position, plaintiff traveled from store to store to prepare the stores for inventories.  (Dowling Dep. at 558).

34.    In February 2001, plaintiff began work as an inventory specialist.  (Dowling Dep. at 564).

35.    As an inventory specialist, plaintiff was paid the same salary as a loss prevention supervisor.  (Dowling Dep. at 624).

36.    Plaintiff understood at the time that she accepted the position that it required "up to approximately 40-60% overnight travel."  (Brady Cert., Exh. 12; Dowling Dep. at 560).

37.    Plaintiff admits that when she accepted the position she did not advise Mr. Hurley that she had any limitations on her ability to perform the job in the Philadelphia market while residing in Maryland.  (Dowling Dep. at 572).

38.    On March 8, 2001, plaintiff received a five-page written associate performance notice from Mr. Hurley documenting plaintiff's "no call/no show" to a scheduled inventory at Store 1221.  (Brady Cert., Exh. 13).  The associate performance notice provides, in pertinent part, that:

---

[13]Plaintiff was not assigned the Maryland area as another employee was placed in the Maryland market as inventory specialist.  (Dowling Dep. at 83).

> On 2/28/01 Tracey was scheduled to be at an inventory at #1221 at 5 am (1 hr. prior to floor count). Tracey did not appear, call the store or myself. . . . I proceeded to page Tracey (3x), call her home (2x) and left her 2 voice mails throughout the day. At 6 p.m., 2/28/01, Tracey called me in my office and stated that she was "sorry" for not contacting anyone in this department as to her status. She stated that on her way home the previous night she had a near accident on the highway. She stated that she went to the doctor's during the day instead. She also stated that she knew she was wrong and apologized to me . . . Also, she clearly was aware the she should have been at her scheduled event and had made a poor decision. She stated that she was aware of the obvious problems that it may have caused for the company without an Inventory Specialist at the store to run the inventory. Despite the requirements of the job, Tracey indicated to me during our conversation that she will not spend overnight stays . . . She stated that her doctor wanted her to go on short-term disability but she refused . . . She asked if we could change her future schedule to allow her not to be traveling as far as the job requires (especially overnight stays). I made adjustments to her schedule for the next 2 wks, relying on associates in the company that do not cover inventories. Tracey and I spoke about the Inventory Control Specialist job requirements (traveling 40% or more) and she stated that she understood and was unsure whether she could perform this function.

(Id.). Plaintiff admits that she did not report to work as scheduled. (Dowling Dep. at 568). Although plaintiff claims the March 8, 2001 performance notice was retaliatory, she does not dispute the contents of the performance notice. (Id. at 586).

39.    Plaintiff acknowledges that employees are written up when they do not show up to work. (Dowling Dep. at 569).

40.    Other than this associate performance notice for failure to appear for her scheduled assignment and to call in to advise of her absence, plaintiff testified that Mr. Hurley did not retaliate against her while she worked in her new position as inventory specialist in 2001.

> Q:    Did Mr. Hurley say or do anything else toward you during the
>        period of time he was your immediate supervisor that caused
>        you to believe he was retaliating against you?
> A:    Dave Hurley specifically?
> Q:    Yes?
> A:    No, <u>Dave Hurley was a good guy to work for</u>.

(Dowling Dep. at 569; emphasis added).

    41.    According to plaintiff, Mr. Hurley did not at any time suggest that she should resign.

(Dowling Dep. at 570).

    42.    Plaintiff testified that her main complaint with her inventory specialist position was the

length of her commute from Maryland to Pennsylvania.

> Q:    Did you have any other issues with your job as inventory
>        specialist other than the problem with the commute itself?
> A:    <u>No</u>.

(Dowling Dep. at 580; emphasis added).

    43.    Plaintiff concedes that Mr. Hurley told her that she could stay overnight at a hotel at

the Company's expense to avoid the long commute, but she declined.  (<u>Id.</u> at 577).

    44.    Plaintiff admits that she understood that the inventory specialist position required 40

to 60 percent travel, and she understood the term "overnight traveling" to mean that she would have

to stay in a hotel.   (Dowling Dep. at 596-98).

    45.    Despite being aware of her job requirements, plaintiff advised Mr. Hurley that she

could not perform her job if it involved the required overnight travel.  (Dowling Dep. at 598-99).  In

response, Mr. Hurley advised plaintiff to provide him with medical documentation regarding her

travel restrictions and then he would discuss alternative arrangements with her.  (<u>Id.</u> at 599).  By

letter dated, March 19, 2001, plaintiff advised Mr. Hurley that the doctor's note that he requested

would be delayed until March 21, 2001.  (Brady Cert., Exh. 14, Dowling Dep. at 601).  Plaintiff admits she never provided Mr. Hurley with a doctor's note setting forth her travel restrictions.  (Id. at 600).

> Q:    Were you able to obtain that note from Dr. McGreal by March 21?
> A:    I didn't get it.
> Q:    Was there a reason?
> A:    Specifically no.

(Id. at 602).

46.    Although plaintiff contends that she had travel restrictions, plaintiff admits that in January 2001, when she returned from leave of absence, she told Home Depot she wanted to work in her "old position" as a loss prevention supervisor in the Bethlehem, Pennsylvania Store while she was residing in Maryland.  (Dowling Dep. at 535).  According to plaintiff, she was willing to travel back and forth from Maryland to Pennsylvania because it "wouldn't have been that extreme" since she could have stayed with her mother who lived in Pennsylvania.  (Id. at 535-36).  Due to the elimination of the loss prevention supervisor position, there was not an "old position" to return to.

47.    Contemporaneous with plaintiff's performance issues as an inventory specialist, and her balking at performing her job if overnight travel was involved, plaintiff received an offer of employment from Lowe's on March 5, 2001, which she accepted on March 13, 2001.  (Brady Cert., Exh. 15; Dowling Dep. at 618).  Plaintiff admits that she intended to start working at Lowe's on March 31, 2001:

> Q:    Did you understand that when you signed this letter you were going to start your employment at Lowe's on March 31, 2001?
> A:    Yes.
> Q:    When you signed this letter on March 13th, accepting this offer of employment you meant it, right?
> A:    Yes.

17

> Q:    It was your intention to work at Lowe's right?
> A:    Yes.

(Dowling Dep. at 618).  Plaintiff explained that she accepted the job at Lowe's because:

> I was familiar with the field.  It was a good company to work for.
> They were a Fortune 500 company.  The pay was there.

(Id. at 623-24).

48.    Thereafter, on March 20, 2001, plaintiff again failed to report to Home Depot for a scheduled inventory.  (Dowling Dep. at 606-07).  On March 21, 2001, Mr. Hurley and plaintiff spoke on the telephone regarding plaintiff's failure to report again to work for an inventory.  (Id. at 607-08). During the telephone conversation, Mr. Hurley advised plaintiff that she would have to work her schedule unless she provided medical documentation concerning her travel restrictions.

> Q.    Did you understand from speaking to Mr. Hurley that if you had given him
>        some kind of note from Dr. McGreal he at least would attempt to see if he
>        could give you an alternative?
> A.    Yes.

(Id. at 611).   Nonetheless, plaintiff admits that she then told Mr. Hurley she was quitting.  (Id. at 610).

49.    Thereafter, Mr. Hurley sent plaintiff a letter documenting their March 21st conversation.  (Brady Cert., Exh. 16; Dowling Dep. at 606).   In his letter, Mr. Hurley states:

> I have delayed sending this action notice in hopes of hearing from you
> regarding this matter.  However, you have failed to supply any further
> information or documentation so that we could discuss an alternative
> opportunity for you.  Additionally, you have failed to show up for
> work since our last discussion.  At this time, I have no alternative but
> to accept your resignation as tendered March 21, 2001.

(Brady Cert., Exh. 16, at ¶ 2).

50.    Plaintiff voluntarily resigned from Home Depot on March 21, 2001. (Brady Cert., Exh. 16; Dowling Dep. at 486). Ten days later, on March 31, 2001, plaintiff commenced employment with Lowe's at an annual starting salary of $40,000.00. (Dowling Dep. at 58, 88-89).

### 3.    Alleged Retaliation

51.    Plaintiff asserts that following her complaint on July 7, 1999 of sexual harassment against Mr. Kihenjo and her filing of a criminal complaint against Mr. Kihenjo, she received disciplinary write-ups and poor performance reviews from her supervisor, Gregg Smith, and thereafter from Dean Drakis, who replaced Mr. Smith as regional loss prevention manager in or around August 1999. (Dowling Dep. at 313-14, 321-22, 416).

52.    Notably, plaintiff concedes that Mr. Drakis did not at any time comment to her about plaintiff's reporting of or filing a complaint against Mr. Kihenjo. (Dowling Dep. at 417).

53.    On or about July 22, 1999, Gregg Smith and Amy Booe met with plaintiff at the Bethlehem Store in connection with certain allegations made by co-workers against plaintiff that came to light during Ms. Booe's investigation of plaintiff's complaint against Mr. Kihenjo. (Dowling Dep. at 295-96). During the course of the investigation, plaintiff's co-workers and fellow managers complained about plaintiff's unprofessional conduct. Specifically, Ms. Booe received the following information: (i) an associate complained that plaintiff touched him and asked him about his personal life which made him feel uncomfortable; (ii) a department head in the electrical department complained that plaintiff had asked him out on a date; and (iii) an assistant manager advised that during a store meeting plaintiff had commented to a female employee that she did not understand an issue because the female employee is blonde. (Booe Dep. at 93-99; Dowling Dep. at 287-90). Plaintiff admits that she engaged in some of the complained of behavior; however, she was unaware

19

that it was offensive to others.  (Dowling Dep. at 287-88; Booe Dep. at 96-97).  Plaintiff was

counseled on Home Depot's Respect Policy.  (Booe Dep. at 94-97; Dowling Dep. at 292).

54.     On August 30, 1999, plaintiff received an associate performance notice for violation

of Company policy by undermining management and discussing her sexual harassment complaint

against Mr. Kihenjo with co-workers.  (Dowling Dep. at 321; Brady Cert., Exh. 17).  Plaintiff admits

that she told approximately 15 to 20 associates about the alleged incident with Mr. Kihenjo.  (Id. at

327).

55.     On October 19, 1999, plaintiff received her mid-year performance review from Dean

Drakis.   Mr. Drakis gave plaintiff an overall rating of "2" as a loss prevention supervisor

("improvement needed; meets some, but does not consistently meet all job expectations").  (Brady

Cert., Exh. 18 at p. 5).  Mr. Drakis rated plaintiff a "2" in the categories of shrink analysis[14] and risk

control.  (Id. at p. 1).  In the "Areas for Improvement" section, Mr. Drakis advised, "[f]ocus on the

basics by driving the shrink plan and dropping areas of minor importance.  Make sure that the shrink

plan compliance worksheet is completed along with W.O.S. [weekly operational summary], in a

timely manner."  (Id. at p. 5).

56.     As a loss prevention supervisor, plaintiff's main responsibility was to develop and

effectively implement and maintain shrink plans for the stores she was assigned.  (Drakis Cert., ¶ 6).

Plaintiff admits that shrink is a key responsibility for a loss prevention supervisor.  (Dowling Dep. at

626).  Plaintiff testified that as a loss prevention supervisor she "was responsible for coordinating the

---

[14]Shrink is the "difference between what you should have had on hand [in the store] or sold versus what you actually have on hand and sold."  (Dowling Dep. at 627).   Loss prevention supervisors were evaluated on their ability to protect Company assets and minimize the loss of merchandise.  (Id.).

stores regarding inventory and regarding the different procedures to keep shrink to a minimum." (Id. at 627).

57.    Prior to her October 1999 review, plaintiff received two performance reviews as a loss prevention supervisor from Gregg Smith -- in October 1998 and March 1999. (Brady Cert., Exhs. 19 and 20). Plaintiff was in the position for less than six months when she received the October 1998 mid-year performance review. In that review, plaintiff did not receive an overall rating, however, she received a "1" rating (not meeting job expectations) in the area of "shrink plan" and a "2" rating in the area of "risk control." (Brady Cert., Exh. 19 at p. 1). Plaintiff's supervisor, Gregg Smith, commented in the Game Plan section of the review that the shrink plan needed to "focus in on top 3 subclass issues in each department" and that "improvement [was] needed in developing partnerships with management staff." In her March 1999 review, plaintiff received an overall rating of "3" (solid performance; meets most job expectations). (Brady Cert., Exh. 20 at p. 5; Dowling Dep. at 646-47). Although she received an overall rating of "3," plaintiff received a "2" rating in shrink analysis. (Brady Cert., Exh. 20 at p. 1). In "Areas for Improvement," Gregg Smith commented that plaintiff "needs to develop with store a shrink plan which focus[es] on operational and subclass issues in the bldg." (Id. at p. 5).

58.    Plaintiff's performance problems with respect to her shrink plan continued when Dean Drakis became her supervisor as reflected in her October 1999 review and thereafter. On February 4, 2000, during a performance management review, Mr. Drakis advised plaintiff that a shrink plan should be completed and sent to him by February 14, 2000. (Brady Cert., Exh. 21 at p. 4). Plaintiff

admitted that she did not send Mr. Drakis a shrink plan by February 14, 2000.[15]  (Dowling Dep. at 664).

59.    On March 8, 2000, plaintiff received an Associate Performance Notice for poor job performance for failure to properly implement a shrink plan.  (Brady Cert., Exh. 22).  The Notice provides:

> Since December of 1999 Tracey has been told to put a shrink plan into place at store # 4110 [Reading Store].  On 2-4-00 during a performance management review Tracey was once again spoken to about not having a shrink plan in place and that one should be completed and sent to me no later than 2-14-2000.  On 2-29-00, during a blitz audit at 4110, it was once again revealed that no shrink plan was in place.  As an L.P.S. this is the most important portion of our core programs.

(Id.).  Plaintiff admits that she did not have a shrink plan in place on February 29, 2000.[16]  (Dowling Dep. at 669).  Plaintiff completed the shrink plan on or about March 16, 2000.  (Id. at 671).

60.    On March 29, 2000, plaintiff received another overall rating of "2" on her performance review by Mr. Drakis.  Mr. Drakis again commented that plaintiff's shrink percentages were over reserve and that she had not timely implemented a shrink plan.  (Brady Cert., Exh. 23; Drakis Dep. at 95).  Mr. Drakis also noted that plaintiff did not adjust the shrink plan for the Bethlehem Store for seasonality, as required, and had not partnered effectively with the managers in the store to create and implement the shrink plan.  (Drakis Dep. at 96).

---

[15]Plaintiff excuses her failure to implement a shrink plan in the Reading Store by February 14, 2000 because the store manager asked her to delay the plan since "there were people on vacation." (Dowling Dep. at 665).

[16]Plaintiff excuses her continued failure to implement a shrink plan by February 29, 2000 because she did not have the required information from the home office in Atlanta to complete the shrink plan.  (Dowling Dep. at 669).

61.     Plaintiff's inability to work with the management team within the stores she was assigned is further supported by Alan Power, then store manager of the Bethlehem Store.[17]  Mr. Power testified that plaintiff did not work effectively with the employees in his store.  (Power Dep. at 24-30).  Mr. Power testified that he received complaints about plaintiff's management style from various employees.  (Id.).

62.     On June 1, 2000, plaintiff was given a two-page document entitled "Game Plan/Expectations," which outlined the areas in which she needed to improve and provided tasks for her to complete.[18]  The document provides, in pertinent part:

> Tracey must also complete all statistical information and reports by established due dates.  These include the shrink plan critical path.  This is to be completed in place 4-5 weeks after an inventory.  The shrink was to be completed no later that 5-3-00.  As of 5-9 no plan was in place and nothing was communicated to the RLPM.

(Brady Cert., Exh. 24).

63.     Thereafter, on July 18, 2000, plaintiff received an Associate Performance Notice for poor performance.  (Dowling Dep. at 682).  The notice, in pertinent part, states, "[i]ssues that still remain include an effective and timely shrink plan, not reviewing shrinks or swells to determine causal factors, not addressing core issues within subclasses, and not measuring the effectiveness of the shrink plan."  (Brady Cert., Exh. 25).  The notice further provides, "If Tracey fails to meet these

---

[17]Dean Drakis also received reports from Home Depot employees complaining about plaintiff's management style.  (Drakis Cert., Exhs. A, C, D, E, and H).

[18]Plaintiff further complains that in June 2000, she was subjected to retaliation when Jay Fogg, Director of Loss Prevention, walked Store 4105 (Bethlehem Store) with her to review the effectiveness of her shrink plan.  (Dowling Dep. at 442).  Plaintiff asserts that this was a form of retaliation because Mr. Fogg had not walked her store in the past.  (Id. at 442-43).  Plaintiff admits, however, that Mr. Fogg walked the stores of other loss prevention supervisors.  (Id. at 443).

23

expectations within the next (30) days, then this will result in her termination." (Id.). Plaintiff was not removed from her position after the 30 days. On the contrary, plaintiff testified that Messrs. Smith and Drakis worked with her to address performance issues, and advised her that she would not lose her job. (Dowling Dep. at 689-90).

64.    In addition to the disciplinary write-ups and the performance reviews, plaintiff complains that she was not trained by Mr. Drakis with respect to loss prevention responsibilities. (Dowling Dep. at 418).

65.    Plaintiff, however, admits that Mr. Drakis was present when she prepared her first shrink plan and arranged for her to attend shrink workshops. (Dowling Dep. at 633-35). In addition, plaintiff testified that he arranged for her to observe John Pollazo, a loss prevention supervisor who implemented very successful shrink plans. (Id. at 634-35, 692-93).

66.    Plaintiff also admits that she was sent to a business plan workshop where she was taught to manage her time more efficiently and shown how to achieve her goals. (Dowling Dep. at 675-76).

67.    Moreover, plaintiff testified that Mr. Drakis and Mr. Smith walked the store with her at different times and pointed out areas in which she could improve.

> Q:    Did they [Mr. Drakis and Mr. Smith] give you any feedback as to how your performance was during either of those walks?
> A:    Though [sic] had said it was getting better.
> Q:    Did they specify or identify where the improvement was?
> A:    Yes, we would go over each area and do an audit. If they wanted something done they would explain it to me.

(Dowling Dep. at 689).

24

68.     Finally, plaintiff complains that she was retaliated against by defendant because she was required to commute more than 50 miles between the Bethlehem and Reading Stores.  (Dowling Dep. at 333-34).  Plaintiff was assigned the Reading Store after she requested in July 1999 that she no longer have to work at the Allentown Store.  (Id. at 116).

69.     Loss prevention supervisors generally are assigned to two stores.  (Drakis Cert., ¶ 4).

70.     Plaintiff testified that she asked Dean Drakis for a transfer from the Bethlehem Store to the Pottstown Store because of the commute between the Reading and Bethlehem Stores. According to plaintiff, the Reading and Bethlehem Stores are located more than 50 miles apart. (Dowling Dep. at 119).

71.     There is no policy at Home Depot that loss prevention supervisors cannot be assigned to stores more than 50 miles apart.  (Drakis Cert., ¶ 5).  Loss prevention supervisors, other than plaintiff, were assigned to stores that were located more than 50 miles apart.  (Drakis Cert., ¶ 5).

72.     Plaintiff was not transferred to the Pottstown Store.  (Dowling Dep. at 123). However, in or about June 2000, plaintiff admits she no longer had responsibility for the Reading Store.  (Id. at 350).  The only store she was assigned was the Bethlehem Store.  (Id. at 116)

73.     In October 2000, plaintiff went on leave of absence.  (Dowling Dep. at 72-73).

## LEGAL ARGUMENT

### POINT I

### HOME DEPOT IS ENTITLED TO SUMMARY JUDGMENT DISMISSING PLAINTIFF'S COMPLAINT BECAUSE NO GENUINE ISSUE OF MATERIAL FACT EXISTS WARRANTING A TRIAL ON ANY OF PLAINTIFF'S CLAIMS

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate where, as here, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). See also Hersh v. Allen Products Co., 789 F.2d 230, 232 (3d Cir. 1986).

The United States Supreme Court has held that: "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). Thus, only disputes over "facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." Id. at 248. In this regard, in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), cert. denied, 484 U.S. 1066 (1988), the Supreme Court concluded that "one of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." Id. at 323-24.

Accordingly, the party opposing a motion for summary judgment must introduce specific evidence showing that there is a genuine issue for trial. See, e.g., Celotex Corp. v. Catrett,

supra, 477 U.S. at 323-24; Williams v. Borough of West Chester, 891 F.2d 458, 464 (3d Cir. 1989).

In Anderson v. Liberty Lobby, Inc., supra, 477 U.S. at 242, the Supreme Court explained that:

> There is no issue for trial unless there is sufficient evidence favoring
> the non-moving party for a jury to return a verdict for that party....If
> the evidence is merely colorable, or is not significantly probative,
> summary judgment may be granted.

Id. at 249 (citations omitted).  See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 586 (1986), cert. denied, 481 U.S. 1029 (1987)("...opponent must do more than simply show

that there is some metaphysical doubt as to the material facts").

The claims set forth in plaintiff's Complaint are ripe for summary disposition, as

plaintiff's proofs on those claims fail to create a genuine issue of material fact warranting a trial.

## POINT II

### HOME DEPOT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM

Title VII makes it unlawful for an employer to discriminate against any individual with

respect to the "compensation, terms, conditions or privileges of employment, because of such

individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e- 2(a)(1).  In order to

prevail on a hostile work environment claim, a plaintiff must establish five elements: (1) that she

suffered intentional discrimination because of her sex; (2) that the discrimination was severe or

pervasive; (3) that the discrimination detrimentally affected the plaintiff; (4) that the discrimination

would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence

of respondeat superior liability.  Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998); Kunin

v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999), cert. denied, 510 U.S. 964 (1993);

27

Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990). In the present case, plaintiff's hostile work environment claim fails because plaintiff cannot establish any basis to impute Mr. Kihenjo's alleged single incident of harassing conduct to Home Depot.

A.    **Mr. Kihenjo Was Plaintiff's Co-Worker**

In Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998), the Supreme Court clarified the standard for holding an employer liable for sexual harassment committed by an employee in cases, such as this, where there is no adverse employment action by the alleged harasser. The Supreme Court held that where an employee is sexually harassed by a co-worker who has no supervisory authority over her, an employer may be liable only if it is negligent. See Faragher, 524 U.S. at 799-800. The Supreme Court also held that where an employee is sexually harassed by her own supervisor, an employer may be liable unless it can show "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807. The first standard - - negligence - - applies here as plaintiff admits that Mr. Kihenjo was not her supervisor.

The Supreme Court has defined "supervisor" as an individual "with immediate (or successively higher) authority over the employee" (emphasis added). Faragher, 524 U.S. at 807; Ellerth, 524 U.S. 742, 765 (1998). In Faragher, the Court noted that the power to supervise includes the authority to "to hire and fire, and to set work schedules and pay rates." Faragher, 524 U.S. at 807. The burden of proof to show that [the harasser] was plaintiff's supervisor lies with plaintiff."

28

Kent v. Henderson, 77 F. Supp. 2d 628, 633 (E.D. Pa. 1999) ("plaintiff must establish employer liability as element of hostile environment claim").

Here, there is no genuine issue of material fact as to whether Mr. Kihenjo had "immediate (or successively higher) authority" over Dowling. Plaintiff, herself, admits that Mr. Kihenjo was not her supervisor, but rather a co-worker. (Facts, ¶ 12). Plaintiff testified:

> Q:    In his capacity as assistant store manager did you have any understanding as to whether or not he could discipline you?
> A:    As an assistant store manager <u>we were peers</u>.
> Q:    Do you have any understanding during the period of time that you worked in store 4108 when Mr. Kihenjo was there whether or not Mr. Kihenjo ever scheduled any of your work schedule or anything like that?
> A:    Not that I know of.

(Facts, ¶ 12; emphasis added).

Thus, Home Depot is not liable for Mr. Kihenjo's alleged conduct and is only responsible if it, as an employer, was negligent.

### B.    Home Depot Is Not Liable Because It Was Not Negligent

An employer is negligent if it "knew or should have known of the harassment and failed to take prompt remedial action." Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999); Kent v. Henderson, 77 F. Supp. 2d 628, 632 (E.D. Pa. 1999). "Prompt remedial action" is conduct "reasonably calculated to prevent further harassment." Bonenberger v. Plymouth Twp., 132 F.3d 20, 26 (3d Cir. 1997) (citing Knabe v. Boury Corp., 114 F.3d 407, 412 (3d Cir. 1997)). Liability for a hostile work environment "is created not by random crude acts of employees, but rather by the employer's reaction or non-reaction to these acts." Hurley v. Atlantic City Police Dep't, 993 F. Supp. 396, 401 (D.N.J. 1996).

Home Depot cannot be found negligent in this case. The undisputed facts are that Home Depot has a written policy against and procedure for reporting any harassment - - which was distributed to all employees, including Dowling. (Facts, ¶¶ 5-7, 9). Plaintiff admits she was provided with her own copy of Home Depot's Associate Handbook which contains a written statement of Home Depot's sexual harassment policy. (Facts, ¶¶ 9, 10). Home Depot's sexual harassment policy contains a "complaint mechanism" through which an aggrieved employee is informed how to present any complaints of harassment or discrimination. (Facts, ¶ 6). Specifically, Home Depot's policy instructs its associates that:

> If you believe you are being harassed or exposed to conduct you find offensive, ask the person to stop immediately. If the conduct continues, contact a member of management. If you are not comfortable discussing the problem with your manager, or if you believe that your concern is not being appropriately resolved, contact your Store Manager, District Manager, Human Resource Manager, or Division VP of Human Resources.

(See Facts, ¶ 6). In addition, the policy provides a 1-800 alert telephone number that is available to associates with concerns. Id.

Here, plaintiff utilized Home Depot's policy and reported the July 2, 1999 alleged harassment to her supervisor on July 7, 1999. Immediately upon receipt of plaintiff's complaint, Home Depot conducted an investigation in accordance with its policies and procedures. (Facts, ¶ 17). Plaintiff admits that when she reported Mr. Kihenjo's purported behavior to her supervisor, Gregg Smith, he immediately contacted the Human Resources Manager, who investigated her allegations and addressed the situation with Mr. Kihenjo. (Facts, ¶ 17). Likewise, plaintiff admits that when she requested to be reassigned from the Allentown Store, where Mr. Kihenjo was the assistant store manager, Home Depot granted her request, and she no longer had any contact with

Mr. Kihenjo. (Facts, ¶ 24). Because Home Depot promptly addressed plaintiff's concerns when she raised them, Home Depot cannot be held liable for Mr. Kihenjo's conduct. See Bouton v. BMW of N. Am., Inc., 29 F.3d 103, 107 (3d. Cir. 1994) ("prompt and effective action by the employer will relieve it of liability"); Kunin v. Sears Roebuck & Co., 175 F.3d 289, 294 (3d Cir. 1999) ("By definition, there is no negligence if the [sexual harassment grievance] procedure is effective."). See also Swentek v. U.S. Air, Inc., 830 F.2d 552 (4th Cir. 1987) (The Court refused to hold the defendant employer liable where it promptly questioned the plaintiff and the individual defendant).

Although plaintiff was dissatisfied with the outcome of the investigation (i.e., that her allegations could not be substantiated and Mr. Kihenjo was not terminated), this is insufficient to hold Home Depot liable for negligence. An employer can act reasonably, yet reach a mistaken conclusion as to whether the accused employee actually committed harassment. See Harris v. L&L Wings, Inc., 132 F.3d 978, 984 (4th Cir. 1997) ("[A] good faith investigation of alleged harassment may satisfy the 'prompt and adequate' response standard, even if the investigation turns up no evidence of harassment . . [and] a jury later concludes that in fact harassment occurred.").

After conducting an investigation, Home Depot here concluded that it could not support a case of sexual harassment against Mr. Kihenjo. (Facts, ¶¶ 17- 23). Having concluded that it had insufficient evidence to sustain a charge of harassment, Home Depot had a legitimate reason for declining to discipline Mr. Kihenjo and resorted instead to counseling him on the anti-harassment policy.[19] See Harris, 132 F.3d at 984 ("We are mindful of the difficulty employers face when dealing

_____

[19]Mr. Kihenjo's plea agreement under the ARD program in November 1999 (Facts, ¶ 24, n.11), four months after Home Depot's internal investigation, has no bearing on whether Home Depot took reasonable steps in responding to plaintiff's complaint of harassment in July 1999. Moreover, plaintiff cannot rely on Linda Wallback to support her claim. Ms. Wallback told Ms. Booe

with claims of harassment, finding themselves between the rock of an inadequate response under Title VII and the hard place of potential tort liability for wrongful discharge of the alleged harasser"; Title VII "in no way requires an employer to dispense with fair procedures for those accused or to discharge every alleged harasser."); <u>Allen v. National R.R. Passenger Corp.</u>, 90 F. Supp.2d 603, 612 (E.D. Pa. 2000) (finding the employer took reasonable steps in response to the complaints it received by counseling and warning the alleged harasser).

Even assuming that the investigation was less than perfect, which it was not, Home Depot nevertheless took prompt action to remedy the situation. (Facts, ¶¶ 17, 19-21). The complained of conduct involved a single incident; plaintiff made no further complaints concerning Mr. Kihenjo. (Facts, ¶ 25). Plaintiff admits that she had no further contact with Mr. Kihenjo. (<u>Id.</u>). Mr. Kihenjo was counseled in writing about Home Depot's Respect Policy. In addition, Home Depot granted plaintiff's request to transfer out of the Allentown Store, despite being unable to substantiate her allegations against Mr. Kihenjo. (<u>Id.</u>). Where, as here, the employer takes prompt steps to stop the harassment, liability cannot be premised on perceived inadequacies in the investigation. <u>See Kunin v. Sears Roebuck & Co.</u>, 175 F.3d 289, 294 (3d Cir. 1999) ("Our precedents provide that when an employer's response stops harassment, there cannot be Title VII liability."). In light of these uncontested circumstances, there is no basis in law or fact to hold Home Depot liable for Mr. Kihenjo's conduct.

**POINT III**

**PLAINTIFF'S CLAIM FOR CONSTRUCTIVE DISCHARGE FAILS AS A MATTER OF LAW**

---

and Mr. Smith that Mr. Kihenjo never physically touched her. (Facts, ¶ 26).

**BECAUSE SHE CANNOT PROFFER ANY EVIDENCE THAT SHE WAS SUBJECT TO INTOLERABLE WORKING CONDITIONS**

Constructive discharge occurs only when an "employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984). To make this showing, "more than subjective perceptions of unfairness or harshness or a stress-filled work environment are required." McLaughlin v. Rose Tree Media Sch. Dist., 52 F. Supp.2d 484, 493 (E.D. Pa. 1999).

Plaintiff bases her claim of constructive discharge on the fact that when she became an inventory specialist in 2001, following Home Depot's elimination of the loss prevention supervisor position, she had a lengthy commute to work from her residence in Maryland to Home Depot's Philadelphia market. (Facts, ¶ 42). Plaintiff testified that she had no other issue with the inventory specialist position other than her commute. (Id.). An increase in commuting distance, however, is not enough to establish constructive discharge, even when combined with plaintiff's feelings that she was being unfairly treated. See Audenreid v. Circuit City Stores, Inc., 97 F.Supp.2d 660, 664 (E.D. Pa. 2000) (dismissing plaintiff's constructive discharge claim based on employer's transferring him to the identical position in a smaller store further away). While plaintiff may have found the commute stressful, and so chose to resign, the test looks to the reasonable person. See DiIenno v. Goodwill Indus., 162 F.3d 235, 236 (3d Cir. 1998) (while an employer cannot transfer an employee to a job the employee cannot do, "a desire to live in a certain city" is not a job-related factor supporting a claim of constructive discharge); Grande v. State Farm Mut. Auto. Ins. Co., 83 F. Supp.2d 559, 564 (E.D. Pa. 2000) (dismissing constructive discharge claim finding that although the plaintiff "may have found the [commuting] distance impossible to tolerate," he had not demonstrated an adverse

33

employment action). Subjective feelings, on their own, are insufficient to find constructive discharge. See Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 168 (3d Cir. 2001) (holding that the plaintiff had not been constructively discharged where she demonstrated that her work environment was "stressful, but not unbearable" from an objective standpoint).

Moreover, plaintiff has failed to proffer any evidence that her commute was deliberately motivated by any impermissible intent by Home Depot. First, plaintiff's commute changed because plaintiff chose to move to Maryland where her boyfriend had moved. (Facts, ¶ 28). Second, plaintiff has not submitted any evidence to establish that defendant deliberately required her to commute in order to create intolerable working conditions or to force her to resign. Plaintiff admits that when she accepted the position of inventory specialist she understood it required extensive travel.[20] (Facts, ¶ 36). Indeed, the job description explicitly states: "This position requires up to approximately 40-60% overnight travel." (Brady Cert., Exh. 12; Facts, ¶ 36). Plaintiff concedes that she did not advise her supervisor, David Hurley, that she had any limitations on her ability to perform the job. (Facts, ¶ 37).

Not only has plaintiff failed to submit evidence of discriminatory intent, Home Depot's actions belie such an intent to force plaintiff's resignation. Plaintiff was told that she could continue

---

[20]Although plaintiff now complains about the commute from Maryland to Home Depot's Philadelphia market, she testified that when she returned from leave of absence in January 2001, after having voluntarily relocated from Pennsylvania to Maryland, she advised Home Depot that she wanted her "old position back in Pennsylvania" and did not believe the commute would "have been that extreme" since she "could have stayed with her mother who lived in Pennsylvania." (Facts, ¶46). The position plaintiff was referring to was loss prevention supervisor in Home Depot's Bethlehem Store. It is undisputed that plaintiff was not returned to her old position as loss prevention supervisor because Home Depot had restructured the loss prevention department, and plaintiff, like others holding the loss prevention supervisor position, had to seek other employment within Home Depot.

34

in her job so long as she reported to work and work the schedule that she was assigned. (Facts, ¶ 48).
Plaintiff admits that her supervisor, David Hurley, never suggested that she resign.  (Facts, ¶ 41); See
Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993), cert. denied, 510 U.S. 964
(1993)(dismissing constructive discharge claim finding that the employer never urged or suggested
that the plaintiff resign or retire).  Plaintiff even concedes that Mr. Hurley "was a good guy to work
for."  (Facts, ¶ 40).  Mr. Hurley attempted to alleviate plaintiff's commuting issues by offering her
the option to stay overnight in a hotel.  (Facts, ¶ 43).  Plaintiff rejected the offer because of her
alleged medical restrictions.  (Facts, ¶ 45).  Plaintiff admits that Mr. Hurley requested medical
documentation for her condition so that he could accommodate her.  (Id.).  She further concedes that
she never provided Mr. Hurley with a doctor's note setting forth her travel restrictions.  (Id.).  Even
after plaintiff resigned, Mr. Hurley delayed processing the action notice finalizing plaintiff's
resignation in order to provide her with additional time to submit the requested medical
documentation.  (Brady Cert., Exh. 16; Facts, ¶ 49).  Home Depot's remedial measures are clearly
not the actions of an employer who is trying to force plaintiff to leave the company.

        In addition, plaintiff failed to explore alternatives at Home Depot before concluding
that resignation was her only option - - that is because plaintiff had already intended on taking an
assistant store manager's position at Lowe's.  See Clowes, supra, 991 F.2d at 1161 (explaining that
"a reasonable employee will explore such alternative avenues thoroughly before coming to the
conclusion that resignation is the only option."); Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976
(3d Cir. 1998) ("employees are not guaranteed stress-free environments and . . . discrimination laws
cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple
expedient of quitting").  Although plaintiff admitted that Mr. Hurley would look into alternatives for

35

the required work-related overnight travel if she provided him with the requested medical information, she never provided the information.   (Facts,¶ 45).  Significantly, when plaintiff chose to resign on March 21, 2001, rather than explore other alternatives at Home Depot, she had been pursuing a position with Lowe's in Maryland since November 2000 and had already accepted an offer of employment with Lowe's with a starting date of March 31, 2001.  (Brady Cert., Exh. 15;  Facts, ¶¶ 29, 47, 50).

The working conditions which plaintiff faced simply were not so intolerable that a reasonable person in plaintiff's position would have felt compelled to resign.  In Connors, 160 F.3d 971, 975 (3d Cir. 1998), the Third Circuit affirmed the employer's motion for summary judgment dismissing the plaintiff's constructive discharge claim.  The plaintiff was offered a choice of an early retirement package or a job with the successor corporation.  The Court found that the plaintiff "deliberated [his] options carefully, and elected an early retirement package . . . [plaintiff] was not fleeing from a stick, [he] was reaching for a carrot".  Id.

Like the plaintiff in Connors, Dowling was not fleeing from a stick, she was reaching for a carrot.  Plaintiff resigned from Home Depot on March 21, 2001 because she had a better deal from Lowe's.  (Brady Cert., Exh. 16; Facts, ¶ 50).  She accepted employment with Lowe's on March 13, 2001, eight days prior to her resignation from Home Depot.  (Id.).  Plaintiff spurned Home Depot's offer to provide her with alternative work arrangements if only she would submit medical documentation to show she could not perform the travel-related duties of her job as inventory specialist.  Plaintiff has produced no evidence that could convince a reasonable jury that her decision to resign was anything but calculated, reasoned and voluntary.  Accordingly, plaintiff's constructive discharge claim must be dismissed.

36

## POINT IV

### PLAINTIFF'S RETALIATION CLAIM FAILS
### AS A MATTER OF LAW

Plaintiff asserts that Home Depot retaliated against her after she complained of sexual harassment and reported the alleged harassment to the police. (Facts, ¶ 51). Retaliation claims are subject to the same three-part burden shifting analysis as discrimination claims articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). See Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d. Cir. 1996), cert. denied, 522 U.S. 914 (1997). See also Reyes v. McDonald Pontiac GMC Truck, Inc., 997 F. Supp. 614, 619 (D.N.J. 1998).    In this regard, it is plaintiff's initial burden to prove "by the preponderance of the evidence a prima facie case of [retaliation]." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252 (1981). To satisfy this burden, plaintiff must demonstrate that: (1) she engaged in a protected activity which was known to the employer; (2) the employer took an adverse employment action against her; and (3) a causal connection exists between her protected activity and the adverse employment action. See Robinson v. City of Pittsburgh, 120 F.3d 1286, 1299 (3d Cir. 1997).

Should plaintiff succeed in presenting a prima facie case, the burden of production shifts to Home Depot to articulate some legitimate, non-retaliatory reason for its actions. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

Once Home Depot "answers its relatively light burden by articulating a legitimate reason" for its decisions, "the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that [Home Depot's] explanation is pretextual." Fuentes v. Perskie, 32 F. 3d at 763. In this regard, it is plaintiff's burden to produce some evidence "from which

a reasonable fact finder could conclude either that the [employer's] proffered justifications are not worthy of credence or that the true reason for the employer's act was [retaliation]." Bray v. Marriott Hotels, 110 F. 3d 986, 990 (3d Cir. 1997); see also Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1072 (3d Cir. 1996), cert. denied, 521 U.S. 1129 (1997) ("The district court must determine whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable fact finder to conclude that the reasons are incredible."). To establish pretext, plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherence, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them 'unworthy of credence.'" Fuentes, 32 F. 3d at 765. See also Pamintuan v. Nanticoke Mem'l Hospital, 192 F. 3d 378 (3d Cir. 1999) ("To avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact finder reasonably to infer that each of the employer's proffered non [retaliatory] reasons was either a post hoc fabrication or otherwise did not actually motivate the employer action").

A.    **Plaintiff Cannot Establish a Prima Facie Case of Retaliation**

1.    **Plaintiff Suffered No Retaliatory Adverse Employment Actions**

The second element of a prima facie case of retaliation requires that plaintiff's protected activity was followed by an actionable adverse action by Home Depot. Retaliatory conduct, other than discharge or refusal to rehire, is adverse "only if it alters the employee's compensation, terms, conditions, or privileges of employment, or deprives him or her of employment opportunities." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997). "Not everything that makes an employee unhappy qualifies as retaliation, for otherwise minor and even

38

trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." Id.

The mere presence of a written reprimand or negative performance review in plaintiff's file does not constitute adverse employment actions.  Only employment actions that have a material adverse impact on the terms or conditions of employment are actionable.  Robinson, 120 F.3d at 1300.

In Weston v. Pennsylvania, 251 F.3d 420 (3d Cir. 2001), the court discussed what constitutes a materially adverse employment action.  In that case, the plaintiff contended that written reprimands placed in his personnel file had been prepared in retaliation for his complaint of sexual harassment.  Id. at 430.  The district court previously found that since the reprimands were written and kept in the plaintiff's file, they were actionable because of their presumed effect on the terms and conditions of employment.  The appeals court reversed, and held that the plaintiff failed to establish how the written reprimands effected a material change in the conditions of employment.   The court found that the plaintiff "suffered no reduction in pay, reassignment, firing, or any similar employment action." Id. at 431.

Similarly,  in  this  case,  plaintiff  has  not  presented  any  evidence  that  the  associate performance notices or the performance reviews she received after July 1999 caused her to lose any employment opportunities or that they caused her any specific harm.[21]  Although plaintiff claims that

---

[21]Plaintiff's contentions that she was retaliated against by (i) Jay Fogg walking her store in June 2000 and (ii) David Hurley giving her a poor performance notice in March 2001 when she did not report to work are similarly without merit.  Plaintiff cannot show these were adverse actions, as plaintiff admits Mr. Fogg walked the stores of other loss prevention supervisors (Facts, ¶ 62, n.18), and acknowledges that employees are written up when they do not show up to work (Facts, ¶ 39).  Thus, the evidence demonstrates that plaintiff was not singled out, but rather was treated just like her

her "2" overall ratings on her October 1999 and March 2000 performance reviews prevented her from applying for sales associate positions during the reorganization of the loss prevention department (Facts, ¶ 55), she ranked the position of sales associate her fourth choice on the Career Interest Worksheet she submitted to Home Depot in January 2001.  (Brady Cert., Exh. 11; Facts, ¶ 30). Plaintiff ranked the inventory specialist position her first choice.  (Facts, ¶ 30).  Plaintiff was offered the inventory specialist position, which she accepted.  (Facts, ¶ 32).  As an inventory specialist, plaintiff was paid the same salary as a loss prevention supervisor.  (Facts, ¶ 35).

Similarly, the Associate Performance Notice that plaintiff received on July 18, 2000 did not cause her to lose any employment opportunities.  Plaintiff was not removed from her position after she received the notice.  On the contrary, plaintiff testified that Messrs. Smith and Drakis worked with her to address her performance issues, and advised her that she would not lose her job. (Facts, ¶63).

As the court stated in <u>Weston</u>, the presumed or speculative effect of an evaluation, without a showing of actual harm, is insufficient to demonstrate an adverse employment action.  <u>See</u> <u>Weston</u>, 251 F.3d at 430-31.  Because plaintiff was not subjected to any tangible, adverse employment action, she cannot establish a <u>prima</u> <u>facie</u> case of unlawful retaliation.

**2.      Plaintiff Cannot Establish Any Causal Connection Between the Actions of Which She Complains and Her Alleged Protected Activities**

---

co-workers.  Moreover, plaintiff's complaint about her commute between the Bethlehem and Reading Stores does not rise to the level of material adverse action. <u>See</u> <u>Boykins v. Lucent Technologies, Inc.</u>, 78 F. Supp.2d 402, 415 (E.D. Pa. 2000) (finding transfer of employee was not adverse employment action).

Even assuming, _arguendo_, that plaintiff's performance reviews and performance notices constitute material adverse employment actions, plaintiff has failed to show a causal link between the issuance of the evaluations and write-ups and her report of harassment. Even if an adverse employment decision follows the protected activity closely in time, there must still be some causal connection between the protected action and the adverse decision. See Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir. 2000) ("It is important to emphasize that it is causation, not temporal proximity that is an element of plaintiff's prima facie case").

Plaintiff asserts that Home Depot retaliated against her after she reported Mr. Kihenjo's alleged sexual harassment by criticizing her performance and giving her overall ratings of "2" on her October 1999 and March 2000 performance reviews. (Facts, ¶¶ 51, 55, 60). Plaintiff's unsupported speculation, however, cannot be reconciled with the unrefutable fact that she was criticized for performance issues _before_ she reported any harassing conduct by Mr. Kihenjo. Specifically, plaintiff received "1" and "2" ratings relating to shrink plan on her October 1998 and March 1999 performance reviews, respectively, given by Gregg Smith. (Facts, ¶ 57). On the March 1999 review, Mr. Smith specifically noted that plaintiff "needs to develop with store a shrink plan which focus[es] on operational and subclass issues in the bldg." (Id. ). Plaintiff admits that as a loss prevention supervisor, shrink is one of the key responsibilities of her job. (Facts, ¶ 56).

Indeed, plaintiff's performance issues with respect to shrink are documented throughout her employment with Home Depot. (Facts, ¶¶ 55, 57, 58, 59, 60, 63). Plaintiff's supervisor, Dean Drakis, repeatedly pointed out areas in which plaintiff needed to improve and advised her of the specific tasks that she had to complete. (Facts, ¶¶ 55, 58, 59, 60, 62, 63, 67). For example, on February 4, 2000, plaintiff was advised that she needed to provide Mr. Drakis with a

41

shrink plan for the Reading Store, Store No. 4110, by February 14, 2000. (Brady Cert., Exh. 21; Facts, ¶ 58). Plaintiff admits that she failed to provide Mr. Drakis with a shrink plan by February 14, 2000. (Facts, ¶ 58). Mr. Drakis inquired on February 29, 2000 as to the status of plaintiff's shrink plan, and it was still not completed. (Facts, ¶ 59). As a result, on March 8, 2000, plaintiff received an Associate Performance Notice for poor performance for failure to properly implement a shrink plan. Mr. Drakis advised plaintiff to have the shrink plan to him by March 16, 2000.[22] (Brady Cert., Exh. 22; Facts, ¶ 59).

Thereafter, on June 1, 2000, plaintiff was provided with a two-page "game plan," which outlined areas she needed to improve. (Brady Cert., Exh. 24; Facts, ¶ 62). On July 18, 2000, plaintiff received another Associate Performance Notice for poor performance. (Brady Cert., Exh. 25; Facts, ¶ 63). Mr. Drakis notes that plaintiff still needs to improve on the following areas: "an effective and timely shrink plan, not reviewing shrinks or swells to determine causal factors, not addressing core issues within subclasses, and not measuring the effectiveness of the shrink plan." (Id.).

Plaintiff's continuous pattern of performance problems regarding shrink issues both before and after July 1999, when she complained of harassment, demonstrate that the actions taken by defendant were not motivated by retaliation but, rather, by a true issue of poor performance. That consistency belies a suggestion of retaliatory animus establishing a causal connection. In Shaner v.

---

[22]Plaintiff's explanation for her failure to have a shrink plan in place by February 2000 -- that store managers were on vacation and she had to obtain certain information from Home Depot's office in Atlanta (Facts, ¶ 58, n. 15; ¶ 59, n. 16), does not explain why it took 6 months for plaintiff to finally complete a shrink plan. Plaintiff did not have a shrink plan in place in the Reading Store until March 2000, more than 6 months after she was assigned to that Store. (Facts, ¶ 59).

Synthes, 204 F.3d 494, 504-05 (3d Cir. 2000), the Third Circuit held that an employee's negative performance evaluations did not evidence retaliation for his filing of an EEOC charge. The record evidence in that case showed that the employee's performance evaluations contained similar criticisms both before and after he filed his EEOC charge. Id. The Court concluded that the record did not support a finding that there was intervening retaliatory animus so as to establish a causal connection between the protected activity and the later performance evaluation, especially in view of the circumstances that the performance evaluations were consistent pre- and post-filing of the charge. Id. at 505, n. 23.

In this case, a similar consistency across Dowling's performance evaluations is found both before and after her reporting of harassment in July 1999, and that consistency belies an inference of causal connection between her complaint against Mr. Kihenjo and the alleged retaliatory actions.[23]

---

[23]In Shaner, the Third Circuit added the following observation with respect to performance evaluations:

> While it is possible that a manager might make a poor evaluation to retaliate against an employee for making an EEOC charge, still it is important that an employer not be dissuaded from making what he believes is an appropriate evaluation by a reason of a fear that the evaluated employee will charge that the evaluation was retaliatory. In this regard, we are well aware that some employees do not recognize their deficiencies and thus erroneously may attribute negative evaluations to an employer's prejudice. Accordingly, in a case like this in which the circumstances simply cannot support an inference that the evaluations were related to the EEOC charges, a court should not hesitate to say so.

204 F.3d at 505.

Not only has plaintiff failed to prove a causal connection between her protected activity and the adverse action, Home Depot's actions belie any retaliatory motive alleged by plaintiff. Indeed, defendant made numerous attempts to assist plaintiff in improving her performance. (Facts, ¶¶ 55, 62, 63, 65-67). Specifically, Dean Drakis arranged for her to attend shrink workshops, business plan workshops, and arranged for plaintiff to observe John Pollazo, a loss prevention supervisor who implemented very successful shrink plans. (Facts, ¶¶ 65, 66). Moreover, Gregg Smith and Dean Drakis performed walks with plaintiff, audited her store and pointed out areas where plaintiff needed to improve. (Facts, ¶ 67). Clearly, defendant's efforts to assist plaintiff with her performance undermines her claim of retaliation.

### B.    Plaintiff Cannot Establish That Home Depot's Actions Were A Pretext For Retaliation

Even if plaintiff could establish a <u>prima facie</u> case of retaliation, which she cannot, plaintiff's retaliation claim still would fail because she cannot demonstrate that Home Depot's actions were a pretext for discrimination.

To overcome Home Depot's articulation of its legitimate reason, poor performance, plaintiff must show that the stated reason is a mere pretext for retaliation. "To discredit the employer's proffered reason, plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." <u>Fuentes v. Perskie</u>, 32 F.3d at 765.

44

Here, plaintiff argues that her performance was satisfactory. But a plaintiff's disagreement with a defendant's evaluation of her performance, or the plaintiff's own perception of her performance, does not demonstrate pretext under the McDonnell Douglas framework. See Billet v. CIGNA Corp., 940 F.2d 812, 825-27 (3d Cir. 1991) (finding that the plaintiff's "view of his performance is not at issue; what matters is the perception of the decision maker").

Plaintiff also attempts to discredit Mr. Drakis' criticisms of her performance by observing that her previous supervisor, Gregg Smith, gave her a "3" overall rating on one prior performance review. This evaluation given by Mr. Smith, however, noted the same deficiencies in plaintiff's performance. (Facts, ¶ 57). In particular, Mr. Smith commented that plaintiff "needs to develop with store a shrink plan which focus[es] on operational and subclass issues in the bldg." (Brady Cert., Exh. 20; Facts, ¶ 57). Even if Mr. Smith had evaluated her well, this alone is insufficient to establish pretext as previous evaluations are irrelevant to determining whether an evaluation at issue is pretextual. See Billet, 940 F.2d at 826 ("prior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual"); Turner v. Schering-Plough Corp., 901 F.2d 335, 343-44 (3d Cir. 1990) (observing that performance evaluations of former supervisor were insufficient to create a material dispute of fact concerning present supervisor's sincerity in making adverse employment decision).

As plaintiff cannot meet her burden of establishing pretext, her retaliation claim must be dismissed.

## POINT V

## HOME DEPOT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR

## PUNITIVE DAMAGES

Assuming arguendo, and contrary to law and fact, that any of plaintiff's claims survive

this motion, plaintiff's demand for punitive damages under Title VII should be stricken.   In

discrimination cases, "like any other case where punitive damages are available, punitive damages

should only be awarded . . . in exceptional cases."  Weiss v. Parker Hannifan Corp., 747 F. Supp.

1118, 1135 (D.N.J. 1990).

In Kolstad v. Am. Dental Ass'n., 527 U.S. 526 (1999), the Supreme Court held that,

under Title VII, a plaintiff need not necessarily demonstrate egregious or exceptional conduct, but

she must prove the employer acted with malice or reckless indifference to the employee's federally

protected rights.  Id. at 535.  This is a subjective standard, implicating the employer's state of mind

regarding its actions.  Id. at 536.  The Supreme Court held that egregious conduct could be a means

by which a plaintiff could establish the subjective intent standard of maliciousness or recklessness, but

it was not an independent requirement of punitive damages.  Id. at 538.  Absent such a showing of

a "bad motive" on the part of the defendant, summary judgment is appropriate on a plaintiff's claim

for punitive damages under Title VII:

> [W]here there is no evidence that gives rise to an inference of actual
> malice or conduct sufficiently outrageous to be deemed equivalent to
> actual malice, the trial court need not, and indeed should not, submit
> the issue of punitive damages to the jury.

Id. at 539 (quoting Chizmar v. Mackie, 896 P.2d 196, 210 (Alaska 1995)).

As set forth above, there is no alleged conduct sufficiently egregious to sustain an

award of punitive damages against Home Depot under Title VII.  The undisputed record does not

contain any evidence from which plaintiff can establish maliciousness or recklessness by Home Depot.

46

As previously discussed, once plaintiff reported the alleged sexual harassment to her supervisor, Home Depot in good faith investigated plaintiff's complaint of harassment. (Facts, ¶¶ 17, 19-21). Also plaintiff's supervisor gave plaintiff the week off because plaintiff appeared upset. (Facts, ¶ 18). The record evidence further demonstrates that Home Depot's investigation was prompt and remedial. (Facts, ¶¶ 17, 19-23). Within 10 days of her complaint, Amy Booe, Human Resources Manager, investigated plaintiff's allegations and then met with plaintiff regarding the outcome of the investigation. (Facts, ¶¶ 17, 19-23). Although Home Depot was unable to substantiate plaintiff's accusations against Mr. Kihenjo, it granted plaintiff's request for reassignment away from the Allentown Store. No further harassment was reported by plaintiff. (Facts, ¶ 24).

Moreover, plaintiff's counseling notices and performance reviews were based on her supervisor's perception of plaintiff's performance. Indeed, plaintiff admits that defendant made numerous attempts to assist her in improving her performance. (Facts, ¶¶ 55, 62, 63, 65-67). Specifically, Dean Drakis arranged for her to attend workshops on shrink and business planning, and arranged for plaintiff to observe another loss prevention supervisor who had implemented a very successful shrink plan. (Facts, ¶¶ 65, 66). Moreover, plaintiff's supervisors performed walks with her, audited her store and advised her of the specific tasks that she had to complete. (Facts, ¶ 67). There simply is no evidence of any malice or bad motive by Home Depot.

For these reasons, plaintiff's claim for punitive damages must be stricken in the event that this matter is not disposed of in its entirety.

47

**CONCLUSION**

For all the foregoing reasons, defendant Home Depot respectfully submits that the

Court must grant its Motion for Summary Judgment, and dismiss plaintiff's Complaint in its entirety.

Respectfully submitted,

CARPENTER, BENNETT & MORRISSEY
Attorneys for Defendant
Home Depot U.S.A., Inc.

By: _____
        Patrick G. Brady
        Pro Hac Vice

Dated: November 8, 2002


Stephen N. Huntington, Esq.
Attorney I.D. No. 02540
HUNTINGTON HODGE & FRANKLIN, P.C.
Associate Counsel for Defendant Home Depot U.S.A., Inc.
1500 John F. Kennedy Blvd.
Suite 1032
Philadelphia, PA 19102
Phone: (215) 523-7900
Fax: (215) 523-7911

48